# The People of the State of New York, Respondent, v Lloyd Paperno, Appellant.

Second Department, October 27, 1980

### APPEARANCES OF COUNSEL

*Hoffman Pollok Mass & Gasthalter (John Pollok* and *Edward Gasthalter* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney (Austin V. Campriello* and *Robert M. Pitler* of counsel), for respondent.

### OPINION OF THE COURT

*Per Curiam.*

In May, 1977 Abram Brown, a law assistant employed by the Supreme Court of the State of New York, New York County, was arrested and charged with bribe receiving in the second degree. Shortly thereafter a New York County Grand Jury commenced an investigation to determine whether public servants had accepted illegal payments of money to influence litigation in the civil term of the Supreme Court. The Grand Jury's inquiry concerned the commission of the crimes of grand larceny by extortion, bribery, bribe receiving, rewarding official misconduct, receiving reward for official misconduct, official misconduct, giving unlawful gratuities, receiving unlawful gratuities, conspiracy and perjury.

The defendant Lloyd Paperno was an attorney who, for some 15 years, was employed by the Supreme Court of the

State of New York in New York County, first as a law assistant and later as a Special Referee. On November 30, and December 13 and 14, 1977, the defendant was called to testify before the Grand Jury under a grant of immunity. Before being questioned, the nature of the Grand Jury's inquiry was explained to defendant, the crimes under investigation were listed, and defendant was told that the Grand Jury wanted to find out whether court employees had solicited or accepted benefits in return for influencing litigation and if they had tried to obtain money from lawyers by threatening to damage the lawyers' practices if moneys were not paid. In addition, the Grand Jury sought to ascertain the identities of any persons who had offered benefits to, or conferred benefits upon, court employees to influence litigation.

Defendant had known Abram Brown since defendant first started working in the court. Brown had trained defendant and they shared an office for two years. Assistant District Attorney Anthony J. Ferrara told defendant that the Grand Jury had already heard testimony about Brown's activities and that it wished to know whether Brown had asked Judges or other employees of the court to give favorable treatment to certain litigants or employees.

One segment of the questioning of defendant before the Grand Jury sought to ascertain whether defendant and/or Brown had been offered, or had solicited, a payment of money from an attorney named Edward Stahl in return for arranging a favorable decision on a motion and cross motion which had been submitted to a Justice of the Supreme Court in a lawsuit in which Stahl was a defendant. Defendant was asked a number of questions which dealt with conversations he had held with Brown or Stahl in early March, 1977. Tape recordings of conversations between Brown and defendant, which had been obtained as a result of court-ordered electronic surveillance, were played for defendant and he was questioned as to the meaning of several passages in these tapes. Defendant testified that he could not recall whether he had ever told Brown that if he drafted an opinion favorable to Stahl, the latter would pay Brown money. Defendant could not recall whether he had ever told Stahl that his contact, Brown, had arranged for a favorable determination of the motion and cross motion in question. He had no recollection of telling Stahl that because of his efforts at the courthouse, Stahl was going to "win" on the motion and cross motion. Defendant

could not recall whether he had ever told Stahl that he could arrange a favorable decision if Stahl would agree to pay money to the person who drafted the decision for the court. He could not recall whether he had told Brown that if the case were settled he would get an extra payment of money from Stahl.

On February 15, 1978 the Grand Jury returned an indictment charging defendant with eight counts of criminal contempt in the first degree in that he was alleged to have contumaciously and unlawfully refused to answer legal and proper interrogatories by giving "equivocal, evasive, conspicuously unbelievable and patently false testimony". The first count of the indictment was dismissed by the court prior to trial.

The remaining seven counts of the indictment were thereafter moved for trial in the Supreme Court, New York County, before Mr. Justice HAROLD J. ROTHWAX and a jury. At the outset defendant moved to recuse Assistant District Attorney Anthony Ferrara who had been assigned to try the case. Ferrara had been the chief interrogator of the defendant before the Grand Jury. The reasons behind the motion to disqualify Ferrara were connected with the proposed line of defense. It was defendant's position that his equivocal answers were not intentionally contumacious because they were engendered by a superabundance of caution founded upon the fear that the prosecution was set upon "trapping" him into a contempt or perjury indictment.

Defendant claimed that he believed that he was a target of the investigation which revolved around the activities of Abram Brown. In the summer of 1977 he learned that his bank records had been subpoenaed by the Grand Jury. Stahl had been called to testify before the Grand Jury and in a conversation with defendant before the latter's own appearance, Stahl told defendant of the hostility of the prosecutors and of the relentless and difficult nature of the examination. Sheldon May, the attorney who accompanied defendant to the Grand Jury, advised him that if he was not 100% certain of an answer to respond "I don't recall". Defendant testified that once in the "pit" of the Grand Jury room he felt isolated, confused and intimidated and that during the course of his interrogation, the prosecutor asked questions in rapid succession and his tone often became loud, insistent, hostile and sometimes nasty and threatening. Ferrara treated him abu-

sively and threw rapid fire questions at him without giving him adequate time to answer, told him to stop taking notes which he needed to avoid becoming confused and required defendant to give "yes" or "no" answers without allowing an explanation. Many of the questions dealt with conversations between defendant and Brown or defendant and Stahl which had occurred some nine months before his Grand Jury appearance. Defendant claimed that his memory of these conversations was dim and that because of the hostile nature of the examination he had cautiously stated that he could not recall so as to avoid a misstep that might provide the prosecutor with an excuse to indict him for perjury.

Within the context of this defense, defendant's perception of the actions and motivation of Assistant District Attorney Ferrara became relevant as to his state of mind, causing him to be extremely cautious in giving the answers he did before the Grand Jury for fear that Ferrara was trying to "trap" and "sandbag" him. Defendant's motion to disqualify Ferrara from acting as the prosecutor at trial was based upon two grounds. First, defendant said that he intended to call Ferrara as a witness on the subject of his hostility, tone of voice and framing of questions. Second, defense counsel argued:

"Mr. Fererra [sic] is going to select a jury. Mr. Fererra [sic] is going to open to a jury. Mr. Fererra's [sic] conduct inside the Grand Jury is going to be placed as a question for this jury to evaluate.

"Now to see him as a prosecutor is unfair to the rights of a defendant, for a fair trial."

The court denied the motion, holding, inter alia, that the way in which Ferrara framed his questions was a matter of record found in the Grand Jury minutes, that proof of Ferrara's tone of voice and apparent hostility could better be proved by calling individual grand jurors who witnessed defendant's interrogation, and that Ferrara's testimony would presumably be that he was not hostile to defendant.

One of the major pieces of evidence in the trial was the record of the proceedings before the Grand Jury. This matter had to be conveyed to the jurors in some manner and the prosecution proposed to read it into the record with Ferrara reading the questions he had asked and another prosecutor reading the answers. Defense counsel vigorously objected to this procedure, contending that the transcript should be read by two neutral court reporters because a reading by Ferrara

would "enhance" his credibility before the jury and permit him to emphasize portions of the transcript by his tone of voice. The court overruled the objection stating in part that "the danger of a District Attorney becoming an advocate * * * seems to me not substantial. So long as he reads the matter properly and neutrally and clearly, it seems to me it is appropriate he reads in that fashion." When he took the stand later in the trial, defendant testified that Ferrara's manner, tone, and speed of questioning were different before the Grand Jury than they were in his rereading before the court.

In summation defendant's counsel argued that Assistant District Attorney Ferrara and his fellow Assistant District Attorney, Wilson, had worked for months and had spent a good deal of money upon the investigation of the bribery of Abram Brown, who died in October, 1977 prior to defendant's appearances before the Grand Jury. Counsel suggested that when Brown died these prosecutors sought to justify their expenditure of time and money by "get[ting] somebody else," namely Paperno. They were not only prosecutors, they were also protagonists who were out to "get", "trap", "trick", and "sandbag" Paperno and so they "contrived" this case. Counsel further suggested that it was unfair for Ferrara, who had questioned defendant before the Grand Jury, to act as prosecutor at the trial. Although the court ruled that this was irrelevant, defendant's counsel argued that Ferrara's "manner" and "tone" of reading the Grand Jury transcript were part of an act and that actually he had been extremely hostile in the Grand Jury.

The prosecutor began his summation by asking the jury to decide "who's on trial here", the prosecutors and the Grand Jury system or the defendant. He suggested that defense counsel's argument concerning the motivation of the District Attorney, whether traps were laid for defendant and whether there "was some tremendous paranoid conspiracy out to get Lloyd Paperno", were "smokescreens", "red herrings" and "blind alleys" thrown out for the purpose of obscuring the real issues. Ferrara denied that he had "put a veneer or a gloss on [his] manner" when reading the Grand Jury transcript at the trial, claiming: "You saw it. You heard it. You experienced what he experienced as nearly as it could be reconstructed." Ferrara's summation was replete with numerous references to what "I" [Ferrara] did during the *res gestae* of the alleged contempt and the events surrounding it.

The jury found defendant guilty as charged and he was sentenced to seven concurrent indeterminate terms of up to three years' imprisonment. Defendant appeals from this judgment of conviction.

Two legal principles are involved in the question of whether Assistant District Attorney Ferrara should have been disqualified. The first is the so-called "advocate-witness" rule which, with certain exceptions, prevents a lawyer from representing a party and serving as a witness in the same trial. The second is the so-called "unsworn witness" rule which prevents a prosecutor from making assertions as to his own personal belief or experiences and thereby adding to the weight of the evidence against the defendant.

### THE ADVOCATE WITNESS RULE

The advocate-witness rule has a long and somewhat clouded history (see Note, The Advocate-Witness Rule: If Z, Then X. But Why? 52 NYUL Rev 1365, 1368-1375; 6 Wigmore, Evidence [Chadbourn Rev], § 1911). At present, the rule is embodied in the provisions of the Code of Professional Responsibility.

The code is divided into three parts: the canons of professional ethics; statements of the ethical considerations which underlie the canons; and certain disciplinary rules governing the conduct of lawyers. Canon 5 states: "A lawyer should exercise independent professional judgment on behalf of a client." Ethical considerations 5-9 and 5-10 with respect to this canon provide, in relevant part:

"EC 5-9. Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate * * * An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

"EC 5-10. * * * It is not objectionable for a lawyer who is a potential witness to be an advocate if it is unlikely that he will be called as a witness because his testimony would be merely cumulative or if his testimony will relate only to an uncontested issue * * * Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate."

The disciplinary rules provide in relevant part:

"DR 5-102. Withdrawal as Counsel When the Lawyer Becomes a Witness.

"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101 (B) (1) through (4).

"(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."

"DR 5-101. Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment. * * *

"(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

"(1) If the testimony will relate solely to an uncontested matter.

"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

A reading of the foregoing provisions of the Code of Professional Responsibility leads to the following conclusions. A lawyer should be disqualified if he must appear as a witness for his own client as to a contested issue of fact, except one which concerns a matter of mere formality or pertains to the nature and value of his legal services (DR 5-102 [A]; DR 5-101

[B]). Where the lawyer is to be called as a witness for his client's opponent, the present code provisions do not require that he be disqualified unless his testimony will be adverse to his client (DR 5-102 [B]; see Ann., 54 ALR3d 100, Prosecuting Attorney as a Witness in Criminal Case, § 16, at p 162).

In the case of *People v District Ct. in & for Third Judicial Dist.* (192 Col 480), the defendant moved to disqualify the individual who had questioned him before the Grand Jury from serving as the trial prosecutor. The prosecution was for perjury and defendant said that he planned to call the prosecutor to establish the meaning, language and contents of the questions which he was accused of answering falsely. The Supreme Court of Colorado granted a writ of prohibition preventing disqualification of the prosecutor, holding that the proposed testimony regarding the subjective meaning of the prosecutor's questions would be irrelevant because the basis of the charge was the objective meaning of the question together with defendant's answers thereto. The Grand Jury transcript was all that was needed to establish the objective meaning of the questions. The prosecutor's possible role as a witness in laying a foundation for the transcript and in corroborating the contents thereof would have been merely cumulative and relevant only to an uncontested matter. Accordingly, the court held (p 482) that "[t]he testimony of the prosecutor simply does not play a significant role in the posture of this case."

The People rely upon this Colorado case to support an affirmance, but in our view it is inapplicable to the case at bar. This is not a perjury case where the only issue is whether the defendant gave false answers to certain questions. Here, the question is whether the defendant committed a contempt of the Grand Jury by giving evasive answers to proper questions. Defendant's state of mind was a crucial factor relating to whether he intentionally failed to answer questions before the Grand Jury and thus evidence as to the prosecutor's bias and hostility against him was relevant to allow the jury to determine whether defendant's excessive caution was engendered, not by a desire to frustrate the Grand Jury inquiry, but rather by a desire to provide truthful but circumspect answers which would avoid a prosecution for contempt or perjury. The prosecutor's actions and bias were not at issue in the Colorado case but they were made an issue here. The case of *People v District Ct. in & for Third Judicial Dist.* (192 Col 480, *supra)* simply stands for the proposition that a motion to recuse a

prosecutor should be denied where his proposed testimony will be irrelevant to the issues in the case.

Another reported case dealing with the "advocate-witness" rule as applied to the disqualification of a prosecutor is *People v Arabadjis* (93 Misc 2d 826, judgment of conviction revd on other grounds 78 AD2d 614). In that case the prosecutor took a statement from the defendant shortly after his arrest. A motion to suppress that statement was denied prior to trial and the People intended to use it as proof of defendant's guilt of felony murder. The defense wished to litigate the issue of the voluntariness of the statement before the jury and defendant moved to recuse the prosecutrix who took the statement upon the ground that he intended to call her as a witness.

The court held that the fact that a prosecutor takes a statement from a defendant does not automatically disqualify him from trying the case against that defendant. If the prosecutor thinks or knows that he should be called as a witness for the People he should *sua sponte* disqualify himself (Code of Professional Responsibility, DR 5-102 [A]). The prosecutrix had previously testified as a defense witness at the *Huntley* hearing to the effect that defendant's confession was voluntary and directly refuted his claim that it was involuntary. The court concluded from this that the testimony of the prosecutrix would be irrelevant if offered as part of defendant's case because it did not tend to establish the contention of the side for whom it was to be offered. Accordingly, it held that the prosecutrix need not be disqualified.

The *Arabadjis* decision *(supra)* is open to several criticisms. First, its conclusion that the testimony of the prosecutrix would not be relevant since it would be adverse to the person seeking to offer it, is doubtful. Relevancy is a concept having to do with a factual issue as a whole and not just one side of that issue. Thus, section 401 of the Proposed Code of Evidence prepared by the State Law Revision Commission states that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact * * * *more probable or less probable* than it would be without the evidence" (emphasis added). Obviously the testimony of the prosecutrix was relevant on the issue of voluntariness. Second, the *Arabadjis* decision concentrates solely upon the advocate-witness rule and ignores the "unsworn witness" problem. If its holding is confined to the question of whether the prosecutrix should have been disqualified under the advocate-witness rule of the

Code of Professional Conduct, the *Arabadjis* decision would better have been based upon the conclusion that since the testimony of the prosecutrix would have been adverse to the party seeking to call her and in favor of her own client (the People of the State of New York), DR 5-102 (B) did not require her disqualification.

■■ We conclude that the trial court in this case properly rejected defendant's request to recuse Assistant District Attorney Ferrara based upon the claim that he intended to call Ferrara as a witness. The present provisions of the Code of Professional Responsibility did not require such disqualification since Ferrara was not to be called as a witness for the People and although he was sought as a witness on behalf of the defendant, his testimony would clearly have been adverse to defendant and in favor of his own client. It is our opinion, however, that Ferrara should have been disqualified from trying this case for the prosecution upon the other ground advanced by defendant, namely the unsworn witness problem.

### THE UNSWORN WITNESS RULE

The holdings of two other New York cases on this subject, *People v Bonilla* (101 Misc 2d 146) and *People v Colon* (NYLJ, June 13, 1977, p 11, col 2) are based primarily upon the prohibition against the prosecutor serving as an "unsworn witness" against the defendant.

In *Bonilla (supra)* a question as to the voluntariness of a confession was raised at trial by the defendant. The jury had seen a video tape of the confession elicited from defendant by Assistant District Attorney Mary Beth Abbate. Ms. Abbate was also the prosecutrix at the trial. Although she did not testify, the defendant moved to disqualify her from making the prosecution's summation to the jury upon the ground that permitting her to sum up would seriously prejudice his rights to a fair trial. The court held that because the jury could not fail to realize that the interrogator on the video tape was the same person who was the prosecutrix at the trial, to permit her to argue in summation to the jury that her conduct in taking the defendant's statement did not render it involuntary, would necessarily inject her own credibility into the trial and make her an unsworn witness against the defendant, a practice which has long been disapproved *(People v Lovello,* 1 NY2d 436; *Berger v United States,* 295 US 78). Accordingly,

the motion to disqualify Assistant District Attorney Abbate from summing up to the jury was granted.

In the *Colon* case *(supra)* the court disqualified the Assistant District Attorneys who had taken confessions from two defendants from serving as the prosecutors at their trials. The court's opinion states in relevant part (p 11, col 3):

"The Colon and McDuffie cases are homicide cases where counsel, in good faith, contend that one of the people in a position to give evidence regarding statements is the prosecutor to whom they were made.

"The circumstance has been brought about because, in the management of the prosecution, the assistant district attorney has been cast in the dual role of prosecutor and witness. It does not help the situation to be told by the prosecutor that he does not intend to testify, and that if the defendant chooses to call him he will be a witness only because of what the defense does.

"In the course of pre-trial proceedings, the defendants' statements are likely to be the subject of Huntley hearings. If not suppressed on the Huntley hearing the 'Q and A' will be read to the jury by the prosecutor as direct evidence of each defendant's guilt. Implicit in the word 'Question' is an extended reading: 'Question by Assistant District Attorney Seligman—Answer by defendant.' The dramatic impact is of a scene with two characters—a tableu vivant of prosecutor and defendant. When the prosecutor delivers his summation every reference to the 'Q and A' recreates an exchange to which he was a party. Necessarily he will urge the jury to accept as credible his participation and his version of the events. * * *

"For the purposes of these motions I am holding that defendants' right to a fair trial will be protected if the District Attorney of New York County is directed to assign an assistant district attorney to the trial of these cases other than the assistant who took the statements from these defendants. Crossmotions by the assistant district attorney to preclude defendants from calling him as a witness are denied."

In short, both the *Bonilla* and *Colon* cases *(supra)* hold that even if the prosecutor who took the confession from defendant did not testify, the defendant would be denied a fair trial if the court were to permit the prosecutor to argue to the jury that his conduct did not violate the defendant's rights.

On January 30, 1980, the Commission on Evaluation of

Professional Standards of the American Bar Association proposed a draft of new Model Rules of Professional Conduct to replace the present Code of Professional Responsibility. At present the draft model rules are the subject of hearings at various Bar Associations around the country[1] and are scheduled for debate by the House of Delegates of the American Bar Association at its February, 1981 annual meeting. The proposed model rules contain a provision which neatly combines the advocate-witness and the unsworn witness rules into the following standard:

"3.9 Litigation in which a Lawyer is Personally Involved

"(a) A lawyer shall not act as advocate, except on the lawyer's own behalf, in litigation in which the lawyer's own conduct is a material issue or in which the lawyer is likely to be a witness, unless:

"(1) The testimony relates to an uncontested issue;

"(2) The testimony relates to the nature and value of legal services rendered in the case; or

"(3) Disqualification of the lawyer would work substantial hardship to the client.

"(b) A lawyer may act as advocate in litigation in which a member of the lawyer's firm is likely to be a witness unless doing so would result in a violation of Rule 1.8 [concerning conflict of interest]."

We approve the principle inherent in the foregoing provision of the model rules, at least for the limited purpose of governing motions to recuse prosecutors in criminal cases. The virtue of this model rule is that it is simple and easy to apply. Although the prosecutors in *Arabadjis* (93 Misc 2d 826, *supra*) *Bonilla* (101 Misc 2d 146, *supra*) and *Colon* (NYLJ, June 13, 1977, p 11, col 2, *supra*) did not take the stand, all should have been disqualified because their conduct in taking the confession was a material issue at trial. The prosecutor in the Colorado case would not have been disqualified because his conduct in questioning before the Grand Jury was not at issue and he was not required as a witness.

■ Applying the spirit of the rule of section 3.9 of the Model Rules of Professional Conduct to the case at bar, we conclude

---

1. They are under substantial attack. (See Bar Groups Oppose Revising Code of Ethics, NYLJ, May 6, 1980, p 1, col 2; ATLA Unveils Ethics Codes, Draft to Counter ABA Proposal Emphasizes Client Rights, Nat LJ, June 23, 1980, p 3, col 2; County Lawyers' Association Opposes a New Ethics Code, NYLJ, Oct. 24, 1980, p 1, col 2.)

that Assistant District Attorney Ferrara should have been disqualified because his conduct (i.e., his tone of voice, alleged hostility and rapidity of questioning, etc.), was an important factor influencing the state of mind of the defendant and was therefore a material issue at the trial. Furthermore, his reenactment of the questioning before the Grand Jury constituted a subtle form of unsworn evidence which substantially blurred the line between Ferrara as an advocate and as a witness.[2]

Although the evidence against defendant was substantial, we do not consider the error to be harmless (see *People v Swanson,* 278 App Div 846; cf. *People v Mangine,* 73 AD2d 816). Quite the contrary, it had the effect of depriving the defendant of a fair trial. The essence of the defense was that in large part because of Ferrara's conduct defendant feared that the prosecution was trying to trap him into a perjury or contempt indictment and therefore he was overly cautious in his answers. When he took the witness stand defendant described Ferrara's manner as intimidating. In his reading of the Grand Jury transcript and in summation, Ferrara urged that this was not the case and that the jury had seen a reenactment of the questioning "as nearly as it could be reconstructed." Thus, a major question of credibility was posed in this case. Was the jury to believe the sworn testimony of the defendant or the unsworn testimony of Ferrara? Lloyd Paperno was the accused defendant. Anthony Ferrara was the public servant charged with his prosecution. It cannot be said that the relative difference in their positions was not apparent to the jury and did not improperly influence their resolution of the issue of credibility. As the Supreme Court of the United States said in *Berger v United States* (295 US 78, 88, *supra):*

"[A public prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer * * *

"It is fair to say that the average jury, in a greater or less

2. We wish, however, to make clear that we do not attribute any improper motives to the District Attorney or any of his assistants in the prosecution of this case.

degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

In addition, the adoption by a prosecutor of the dual roles of advocate and witness (either sworn or unsworn) leads inevitably to the confusion of argument with testimony. When a prosecutor is required in argument to discuss his own prior conduct in the case, the jury can easily become confused as to whether his statements should be taken as proof or as analysis of the evidence given by others. Disqualification of the prosecutor is therefore necessary in such circumstances.

Accordingly, the judgment appealed from should be reversed and the matter remitted for a new trial.

HOPKINS, J. P., DAMIANI, O'CONNOR and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, New York County, rendered June 14, 1979, reversed, on the law, and new trial ordered. (The appeal was transferred to this court by order of the Appellate Division, First Department, dated February 28, 1980.)