OPINION OF THE COURT
Chief Judge Breitel.
Defendant, a bail bond agent called before a Grand Jury investigating usury and extortion, was convicted after jury trial for criminal contempt in the first degree (Penal Law, *234 § 215.51). She was sentenced to an unconditional discharge. The Appellate Division affirmed, one Justice dissenting, and defendant appeals.
The primary issue is whether, in the face of extensive questioning, defendant’s inability to recall, or testify consistently about, recent business transactions involving large sums of money was so evasive or falsely equivocal and contradictory as to amount to no answer at all.
There should be an affirmance. It was not unreasonable to expect defendant, an active businesswoman throughout her life, to recall the approximate dates and purpose of $1,000 payments made by her on loans taken out nine and four months earlier. The loans were critical to her business as a bail bond agent, and the questioner provided more than enough cues, through restatement and repetition, to stimulate her recollection. (See People v Pomerantz, 46 NY2d 240, decided herewith; cf. People v Tyler, 46 NY2d 251, decided herewith.)
The defendant, 70 years old at the time of trial, has been in the insurance business since she was 15, and a bail bond agent for the last 25 years. Called in July, 1972 before a Grand Jury investigating "loan-sharking”, that is, crimina} usury and grand larceny by extortion, defendant was granted immunity and was told that she was not a target of the investigation. She made three Grand Jury appearances.
Evidence before the Grand Jury indicated that one Vincent Rizzo, a suspected loan shark, had lent money to defendant, that defendant had repaid him, and that Rizzo had telephoned defendant a number of times to demand money. Included in the evidence before the Grand Jury was a telephone conversation, wiretapped on March 28, 1972, in which defendant, Rizzo, and one Patty Marino, or "Fatso”, discussed two $1,000 payments by defendant to Rizzo.
Suspecting that the $1,000 payments were, in part, usurious interest, the questioner concentrated on Rizzo’s most recent loans to defendant and defendant’s payments on the loans. At one point defendant did tell the Grand Jury that in two transactions, one in November, 1971 and the other in March, 1972, she had borrowed a total of $7,500. According to defen- ' dant, however, the loans, which she repaid in weekly installments, were unrecorded and interest free.*
*235 Her testimony was otherwise not illuminating. With respect to the loans, defendant altered her statements about how many there were and the amounts. Although defendant conceded that $1,000 payments were for her unusually large, she could not be precise about why she made them. First describing the payments as in satisfaction of the loans, and later saying they were to ensure her continued ability to borrow money interest free, defendant ultimately professed inability to recall. While defendant kept precise general business records, of her payments to Rizzo she only made notes on a slip of paper, relying on him to advise her of what she owed. When excused to find those notes, however, she returned empty-handed.
More than 1,000 questions were asked defendant in July, 1972, a significant portion relating to the Rizzo loans. The following is but illustrative:
"Q. Did you ever pay [Rizzo] $1,000 at one time on this loan?
"A. Did I ever pay him back a 1,000?
"Q. Yes, on this particular loan?
"A. No, I don’t think so. I don’t remember, I will be honest with you, I really don’t.
* * *
"Q. * * * on March 28, 1972 did you pay a person called Fatso $1,000?
"A. I don’t remember. I really don’t.
"Q. Did you tell Vincent Rizzo that you did?
“A. I don’t remember
* * *
"Q. Do you remember giving him $1,000?
“A. Yes, I do.
"Q. You did give him $1,000?
"A. Yes, but I don’t know what date.
* * *
"Q. How often have you paid Vincent Rizzo $1,000 at one time?
*236 "A. Not very often.
"Q. How many times?
"A. Oh, on two or three occasions.
"Q. Within the past year? Within the past, say from October 1971 to the present, how many times have you paid him $1,000?
"A. Maybe twice.
"Q. Okay. You remember the two times you paid him $1,000?
"A. No, I don’t remember, sir.
* * *
"Q. [The two payments of $1,000 were] to repay the loan, the money he gave you?
"A. That is right, to defray the loan, yes.
* * *
"Q. Why did you pay him $1,000?
"A. In order to keep good faith.
* * *
"Q. * * * on March 28th, 1972, you paid Patty Marino a $1,000, is that correct?
"A. I don’t remember that, I really don’t.
"Q. Was it the early part of March, March 28th, 1972?
"A. I don’t remember that.
"Q. Do you deny paying Patty Marino a $1,000 on March 28th, 1972 with a promise to pay another $1,000 soon after?
"A. I don’t remember that.
"Q. Do you deny it happening?
"A. I don’t remember it sir.
"Q. All right. Isn’t it a fact that yesterday you told this grand jury that you remember that you paid him a $1,000?
"A. Well, why should he give me $4,000. I don’t remember that then.”
As the examination was ending, defendant conceded that her testimony "doesn’t make sense”.
Defendant was charged with two counts of perjury in the first degree and two counts of criminal contempt in the first degree. At trial the People relied largely on the Grand Jury minutes. Defendant continued to allege that she had responded in the Grand Jury to the best of her ability. Although *237 acquitted of the perjury charges, defendant was convicted on the contempt counts, one of which was, however, dismissed at sentencing on consent of the prosecutor. The fourth count, on which defendant stands convicted, charges her with giving "conspicuously unbelievable, evasive, conflicting, equivocal and patently false answers” to questions about the $1,000 payments.
It is not just a flat refusal to answer that is punishable as criminal contempt under section 215.51 of the Penal Law. Similarly within the statute are "false and evasive profession of an inability to recall” and hopelessly contradictory responses repeatedly changed or altered (People v Ianniello, 36 NY2d 137, 142, cert den 423 US 831; see People v Martin, 47 AD2d 883, 884, affd 42 NY2d 882; compare People v Renaghan, 33 NY2d 991, 992; see, also, People ex rel. Valenti v McCloskey, 6 NY2d 390, 398, app dsmd 361 US 534). With either kind of response the jury may conclude that the testimony is an answer in form only, tantamount to no answer at all.
Pertinent, although arising in a different context, are People v Tyler (46 NY2d 251, supra) and People v Pomerantz (46 NY2d 240, supra), decided today. In both cases the validity of a perjury conviction for testimony given to the Grand Jury was tested, and in each instance the nature of the event that was the object of questioning was critical in assessing the witness’ capacity to recall. In the Tyler case, the conviction could not stand because the alleged false testimony concerned peripheral details of time and place of a meeting not shown to be material to the Grand Jury investigation and was tainted by a purpose to trap the defendant into perjury. In the Pomerantz case, on the other hand, where the judgment of conviction stands, the perjurious answers related, in part, to the substance of a meeting at which corrupt practices then under investigation by the Grand Jury were discussed by defendant, and the purpose of the questioning was to establish proof of antecedent crime. Pivotal in both cases, also, was whether the events or the details to be recalled were, on the record, significant and therefore memorable.
So, too, the jury’s finding in this case is supported by legally sufficient evidence because the large sums borrowed by defendant from Rizzo were memorable. Defendant, active in insurance all her life, was an astute operator in an unusually exacting and earthy business. Due to the nature of the busi *238 ness, survival turned on ability to keep track of moneys. As defendant asserts, she has assumed liability for millions of dollars in the course of her career. Money is not incidental to writing bail bonds; money is largely the essence of it.
It is thus highly unlikely that defendant did not meticulously, even if "off the books”, record her debts and her payments to Rizzo and Marino. She admitted that she kept detailed records in her business. She asserted, however, that she was unsuccessful in locating the entries covering her loans from and payments to Rizzo and Marino. Even if it be true that she relied on Rizzo to keep the paper account of these loans, that a person with defendant’s experience and business sense did not have a lively and independent recollection is incredible. The prosecutor was not questioning about payments of a few dollars, but lump sums of $1,000 each, sums which defendant admitted were for her unusually large. Like the blind man, or even an astute illiterate, who does not depend on written entries to document his affairs, one may be sure that the seasoned defendant, because it would be crucial to her, remembered precisely how and why and for what she had repaid Rizzo.
It is significant, too, that the prosecutor, like the questioner in the Pomerantz case (supra), gave defendant ample cues to stimulate her recollection. Substantial time was devoted to the topic, and the questions, like those in the Pomerantz case, were repeated, restated, and elaborated upon until it was evident that further pressing would produce only the same evasive and contradictory responses.
Of course, not every person called before the Grand Jury is able to satisfy the prosecutor’s pursuit of evidence. But defendant’s equivocation, her denials of recollection, and her hopeless weaving and dodging were not the responses of a truth-telling witness. The significance of the transactions having been demonstrated, defendant’s lack of recollection and evasions are, on their face, explainable only as contemptuous, that is, answers in form only, tantamount to no answers at all. The jury’s finding that she was guilty of criminal contempt, therefore, was amply supported.
Defendant’s other point, that the court’s charge amounted to a direction to return a verdict of guilty, does not require extensive discussion. Defendant objects to the third of three illustrations used by the court in explaining evasive contempt. "Another example might be a consistent lack of memory or *239 recollection of all transactions for a recently passed period relating to large and significant expenditures covering a principal activity or a business. Now this wouldn’t be understandable except as a deliberate and contemptuous evasion of the questions put.” The illustration, taken from People ex rel. Valenti v McCloskey (6 NY2d 390, 399-400, supra, quoting People v De Feo, 284 App Div 622, 624-625, revd on other grounds 308 NY 595), was followed by an enumeration of what factors could be considered in determining whether defendant’s "professed inability to recall was honestly stated or was a deliberate and intentional evasion”. The illustration was apt and concerned the core of the case; it did not so detail the prosecution’s case as, in effect, to advise or direct the jury what verdict it should render. Even if the illustration were closer to the facts than it should have been, and it certainly would have been more conservative to make it a little less "apt”, there could be no harm. That was what the case was about and what it had to be about. In short, defendant’s argument amounts to no more than that "the shoe fit” too well. It did.
As in People v Pomerantz (46 NY2d 240, supra), a caveat is appropriate. A formalistic adherence to any kind of questioning which does not in fact relate to a search for evidence of antecedent crime will not suffice to sustain a conviction for the crime of contempt. There must not only be an appearance of the pursuit of evidence of antecedent crime but it must also be the reality.
Accordingly, the order of the Appellate Division should be affirmed.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.

 Rizzo was ultimately indicted by the New York County Grand Jury for extortion *235 and related crimes. The record indicates, however, that the indictment was dismissed in light of his conviction on Federal charges, for which a substantial sentence was imposed. Marino, too, was indicted by the State Grand Jury, but appears to have fled.